UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4517

WILLIAM ANDREW TAYLOR,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4518

STEVEN BLAKE DAVIS,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CR-97-40-A)

Argued: May 7, 1999

Decided: August 16, 1999

Before WILLIAMS, MICHAEL, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Edward Jessee, JESSEE & READ, P.C., Abingdon,
Virginia; James Douglas Fleenor, Bristol, Virginia, for Appellants.

Steven Randall Ramseyer, Assistant United States Attorney, Abingdon, Virginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Abingdon, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

William Andrew Taylor and Steven Blake Davis (Defendants), inmates at the Bland Correctional Center in Bland County Virginia, were convicted of conspiring with Thomas Ray Lephew, a correctional officer at the Bland Correctional Center, to distribute controlled substances in violation of 21 U.S.C.A. § 846 (West Supp. 1999). On appeal, Defendants make numerous challenges to their convictions and sentences. Finding no reversible error, we affirm.

I.

In October of 1994, an agent of the Virginia Department of Corrections, Bureau of Internal Affairs, provided information to Terry Vlug, a United States Postal Inspector, indicating that Thomas Ray Lephew was possibly receiving controlled substances through the mail and then delivering them to inmates at the Bland Correctional Center. As a consequence, Postal Inspector Vlug began to monitor the mail received at a post office box rented by Lephew. Over a seven-week period, five separate packages were delivered to Lephew's post office box. After the packages' mailing labels were photocopied, three were delivered and two were retained by Postal Inspector Vlug.

On January 24, 1995, Postal Inspector Vlug and an Internal Affairs Agent interviewed Lephew at the Bland Correctional Center. Lephew admitted renting a post office box for the purpose of receiving adult material, but denied receiving any packages. Lephew was then shown

2

the two packages addressed to him, at which time he gave permission for the packages to be opened. The first package held a baggie containing green plant material, another baggie containing a powdery substance, and ten yellow tablets. The second package contained a telephone book. Four baggies containing white powder were discovered in a cut-out section of the book.[1]

After being advised of his rights, Lephew expressed his desire to tell the truth about the packages. Lephew then confessed that he had been receiving packages containing drugs through the U.S. Mail for approximately three years (since March of 1992). According to Lephew, he delivered the drugs to William Andrew Taylor and Steven Blake Davis, inmates at the Bland Correctional Center. Lephew stated that he had made at least one delivery per week to Taylor and Davis and that he was paid $150 in cash for each delivery.

On October 8, 1997, a federal grand jury returned a four-count indictment against Taylor, Davis, and Lephew. Count One charged that all three conspired to distribute controlled substances in violation of 21 U.S.C.A. §§ 841(a)(1) & 846 (West Supp. 1999). Count Two charged Taylor with using the mail to facilitate the conspiracy in violation of 21 U.S.C.A. § 843(b) (West Supp. 1999). Counts Three and Four charged Davis with using the mail for the same purpose in violation of 21 U.S.C.A. § 843(b). On November 12, 1997, Lephew pleaded guilty to Count One pursuant to a written plea agreement.

On March 17, 1998, the U.S. Attorney's Office for the Western District of Virginia filed an information as to Davis pursuant to 21 U.S.C.A. § 851 (West 1981), listing the previous convictions the Government would rely upon for increasing Davis's sentence if he was convicted. A jury trial was convened on March 20, 1998. Prior to the presentation of evidence, the U.S. Attorney's Office moved for the dismissal of Counts Two, Three, and Four. After the presentation

_____

[1] The substances from both packages were submitted to the U.S. Postal Inspection Service Crime Laboratory for analysis. The first package contained 3.41 grams of marijuana, ten diazepam tablets, and 1.16 grams of a mixture containing d-methamphetamine. The second package contained a total of 10.83 grams of cocaine powder.

of evidence, closing arguments, and deliberation, the jury found Taylor and Davis guilty on Count One.

On July 6, 1998, Taylor and Davis were sentenced pursuant to the drug trafficking guideline. See U.S. Sentencing Guidelines Manual § 2D1.1 (1997). At sentencing, the district court found that 242 kilograms of marijuana were delivered to Taylor and Davis during the course of the conspiracy. Due to the amount of drugs involved, Taylor's and Davis's base offense levels were set at twenty-six. See U.S.S.G. § 2D1.1(c)(7). Because the district court found that Taylor committed perjury, his base offense level was increased an additional two levels for obstruction of justice. See U.S.S.G. § 3C1.1.

With an adjusted offense level of 28 and a criminal history category of III, Taylor's guideline range was 97-121 months. See U.S.S.G. Ch.5, Pt.A. Finding that Taylor's criminal history category did not adequately reflect the seriousness of his criminal history, the district court departed upward pursuant to § 4A1.3, p.s. Specifically, the district court noted that but for the consolidation of two prior convictions for violent felonies, Taylor would be considered a career offender under § 4B1.1. As a career offender, Taylor's base offense level would have been 37, see U.S.S.G. § 4B1.1, and, as a result, his guideline range would have been 262-327 months, see U.S.S.G. Ch.5, Pt.A. Taylor was sentenced to a term of 265 months imprisonment.

With an adjusted offense level of 26 and a criminal history category of VI, Davis's guideline range was 120-150 months. See U.S.S.G. Ch.5, Pt.A. Finding that Davis's criminal history category did not adequately reflect the seriousness of Davis's criminal history or the likelihood that he would commit future crimes, the district court departed upward pursuant to § 4A1.3, p.s. After reviewing Davis's lengthy criminal history, the district court concluded that Davis should be considered a career offender under § 4B1.1. As a career offender, Davis's base offense level would have been 37, see U.S.S.G. § 4B1.1, and, as a result, his guideline range would have been 360 months to life, see U.S.S.G. Ch.5, Pt.A. Davis was sentenced to a term of 480 months imprisonment. Defendants filed timely notices of appeal.

On appeal, Defendants make numerous challenges to their convictions and sentences. First, Defendants allege that the testimony of

Lephew should have been suppressed because it was made in exchange for something of value in violation of 18 U.S.C.A. § 201(c)(2) (West Supp. 1999). Second, Defendants contend that the evidence was insufficient to prove beyond a reasonable doubt that they participated in a conspiracy to distribute drugs. Third, Defendants challenge several of the district court's evidentiary rulings. Fourth, Defendants argue that district court abused its discretion in departing upward from the Sentencing Guidelines pursuant to § 4A1.3, p.s. Finally, Defendants contend that the district court erred in calculating the weight of the drugs attributable to the conspiracy. We address these claims in turn.

II.

Defendants first contend that their convictions should be reversed on the ground that the Government offered leniency to Lephew in exchange for his testimony. Defendants claim that this practice violates the federal bribery statute, 18 U.S.C.A. § 201(c)(2) (West Supp. 1999), which prohibits the giving of "anything of value" to a witness because of his or her testimony. As support for their contention, Defendants primarily rely upon United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), which held that any promise made by the Government to a witness in exchange for truthful testimony violates § 201(c)(2). That decision, however, has been vacated by the Tenth Circuit. In fact, after rehearing the case en banc, the Tenth Circuit has since held that § 201(c)(2) does not apply to the United States or an Assistant United States Attorney functioning within the official scope of the office. See United States v. Singleton , 165 F.3d 1297, 1300 (10th Cir. 1999) (en banc).

Notwithstanding the most recent decision of the Tenth Circuit, Defendants continue to contend that § 201(c)(2) applies to the Government in the prosecution of criminal offenses. Specifically, Defendants argue that the plain language of the statute permits no answer but that it does. The Government, in contrast, counters that such a reading is clearly wrong. Whether § 201(c)(2) applies to the Government in the prosecution of criminal offenses is a legal question and, therefore, subject to de novo review. See United States v. Hall, 972 F.2d 67, 69 (4th Cir. 1992) (noting that interpretation of a statute is a purely legal question calling for de novo review).

5

The federal bribery statute provides, in pertinent part, as follows:

> Whoever . . . directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial . . . before any court . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C.A. § 201(c)(2). As the Tenth Circuit recently noted, Defendants' interpretation of the statute is patently absurd:

> When an assistant United States Attorney (AUSA) enters into a plea agreement with a defendant, that plea agreement is between the United States government and the defendant. When an AUSA uses at trial testimony obtained through a plea agreement or an agreement not to prosecute, he does so as the government. An AUSA who, pursuant to the provisions of the United States Sentencing Guidelines, moves for a downward departure under § 5K1.1, does so as the government.
>
> Put into proper context, then, the defendant's argument is: in a criminal prosecution, the word "whoever" in the statute includes within its scope the United States acting in its sovereign capacity. Extending that premise to its logical conclusion, the defendant implies Congress must have intended to subject the United States to the provisions of section 201(c)(2), and, consequently, like any other violator, to criminal prosecution. Reduced to this logical conclusion, the basic argument of the defendant is patently absurd.

Singleton, 165 F.3d at 1300 (citations and internal quotation marks omitted). We find the Tenth Circuit's rationale persuasive. Based upon the statute's purpose, it is clear that § 201(c)(2) was not intended to apply to the United States or its attorneys. Accordingly, we find this claim to be meritless.

III.

Next, Defendants contend that the evidence was insufficient to prove beyond a reasonable doubt that they participated in a conspir-

6

acy to distribute drugs. When assessing the sufficiency of the evidence of a criminal conviction on direct review,"[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

To prove a conspiracy to distribute controlled substances, the Government must establish: 1) an agreement to possess controlled substances with intent to distribute existed between two or more persons; 2) the defendant knew of the conspiracy; and 3) the defendant knowingly and voluntarily became a part of the conspiracy. See United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984). At issue here is whether the Government established, beyond a reasonable doubt, that Defendants intended to distribute the controlled substances that they purchased from Lephew.

Evidence that Taylor distributed drugs was simply overwhelming. In addition to Lephew's testimony, four inmates from the Bland Correctional Center testified that they either purchased drugs from Taylor or paid for their drug purchases by sending money orders to Virginia Taylor, Taylor's wife. We recognize, however, that not one witness testified that he purchased drugs from Davis. Indeed, Lephew testified that he never saw Davis distribute drugs to a third party. During deliberations, even the jury noted, in a letter to the district court, the absence of any direct evidence that Davis distributed drugs:

> Your Honor:
>
> We are unclear whether we heard anyone testify [that] they purchased drugs from Steven B. Davis. Could you please clarify this for us.
> Thank you

(J.A. at 502.)**2**

_____

**2** In response to the jury's question, the district court wrote to the jury as follows:

> All questions of fact are up to you, the jury. I am not permitted to tell you what the facts are in the case.

7

Despite the absence of direct evidence that Davis personally distributed drugs, the evidence was sufficient to convict Davis of conspiring to distribute drugs. See Blumenthal v. United States, 332 U.S. 539, 557 (1947) (noting that by its very nature a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement). A conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. See Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975). In fact, circumstantial evidence is sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis of innocence. See United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989). If substantial evidence exists to support a verdict, the verdict must be sustained. See Glasser , 315 U.S. at 80.

Lephew testified that Davis and Taylor considered themselves partners, and that the partnership specifically contemplated the distribution of drugs to third parties. Indeed, both conclusions can be readily drawn from Defendants' course of conduct. Although drugs were mailed to Lephew both from friends of Davis and from friends of Taylor, Lephew would deliver the drugs to either Defendant regardless of the drug's source. Similarly, Davis would pay Lephew for the drugs even when the drugs were delivered to Taylor. As noted above, there was overwhelming evidence that Davis's partner did, in fact, sell drugs to third parties. Thus, that Davis did not sell any drugs is of no import, the jury could infer Davis's intent to distribute from his partnership with Taylor. See United States v. Burgos, 94 F.3d 849, 859 (4th Cir. 1996) (en banc) (holding that "a variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction").

In addition, Davis's intent to distribute may be inferred from the amount of drugs he purchased over the course of the alleged conspir-

_____

(J.A. at 502.) Although Davis makes much of the jury's question concerning the lack of direct evidence, Davis does not dispute that circumstantial evidence is sufficient to support a guilty verdict. Because there was sufficient circumstantial evidence of Davis's intent to distribute, the jury's question to the district court is not evidence, as Davis claims, that the jury harbored reasonable doubt as to his intent to distribute controlled substances.

8

acy. See id. at 873 (noting that intent to distribute can be inferred from the amount of drugs involved); United States v. Fisher, 912 F.2d 728, 730 (4th Cir. 1990) (finding that intent to distribute can be inferred when the amount of the controlled substance is larger than would be expected for personal use). Taylor and Davis purchased over 240 kilograms of marijuana during the course of the charged conspiracy. This amount is simply too large for personal consumption, see, e.g., United States v. LaMarr , 75 F.3d 964, 973 (4th Cir. 1996) (holding that 5.72 grams of crack was consistent with distribution), especially given the context in which the drugs were purchased, see, e.g., United States v. Damerville, 27 F.3d 254, 259 (7th Cir. 1994) (recognizing that what may be considered a small amount of drugs on the street could be considered a large amount in prison). Indeed, a defense witness testified that the cocaine found in the second package, which was mailed to Lephew from one of Davis's friends, could be broken down into approximately 125 units that could be sold in prison for $50 a unit. A jury could infer from such evidence that Davis intended to distribute the cocaine.

Because a rational trier of fact could have found that Taylor and Davis possessed the drugs with the intent to distribute, the district court did not err in denying their motions for judgment of acquittal. See Burgos, 94 F.3d at 862, 873.

IV.

Next, Defendants challenge several of the district court's evidentiary rulings. Specifically, Defendants argue that the district court erred when it allowed the Government (1) to introduce evidence that Davis had tested positive for marijuana use during the course of the conspiracy; (2) to introduce Davis's prior drug-related felony convictions; (3) to introduce inmate visiting request forms; (4) to cross-examine several of Taylor's witnesses on matters not raised during direct examination; (5) to introduce drugs and packages into evidence without establishing a proper chain of custody; (6) to discuss a lab report that was not properly introduced; and (7) to introduce the grand jury testimony of three witnesses. We address these arguments in turn, keeping in mind that a district court's evidentiary rulings are reviewed under the narrow abuse of discretion standard. See United States v. Sanchez, 118 F.3d 192, 195 (4th Cir. 1997).

9

A.

First, Defendants argue that the district court erred when it allowed the Government to introduce evidence that Davis had tested positive for marijuana use during the course of the conspiracy. During the course of the trial, a Government witness, Lieutenant George Hughes, testified about the contents of an offense report that contained the results of Davis's test for marijuana. Defendants objected to the testimony only on the ground that Lieutenant Hughes did not conduct the analysis of Davis's urine, and as such, his testimony was clearly hearsay. See Fed. R. Evid. 802. Assuming that the evidence in question should not have been introduced through Lieutenant Hughes, the error was harmless. Taylor testified at trial that Davis had told him that he tested positive for marijuana. Thus, the jury would have learned of Davis's positive test without the introduction of the offense report.

B.

Next, Defendants argue that the district court erred when it allowed the Government to introduce Davis's prior drug-related felony convictions. At trial, the Government introduced evidence that in 1979 Davis pleaded guilty to conspiracy to deliver controlled substances to an inmate. Davis contends that the evidence of his prior crimes violated Rule 404(b) of the Federal Rules of Evidence. For the reasons that follow, we disagree.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Rule 404(b), however, does not end there. It expressly states that evidence of other crimes, wrongs, or acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. Moreover, it is well established that that list "is illustrative rather than exclusionary." United States v. Powers, 59 F.3d 1460, 1464 (4th Cir. 1995); see also United States v. Stockton, 788 F.2d 210, 219 n.15 (4th Cir. 1986) (noting that impeachment is a proper use of "other crimes" evidence, even though not listed in Rule 404(b)). In fact, by its own terms, Rule 404(b) expressly only excludes evidence of other crimes, wrongs, or acts when it is used to prove a defendant's bad character or to "show

10

action in conformity therewith." See, e.g. , Powers, 59 F.3d at 1464 (recognizing "Rule 404(b) as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition" (internal quotation marks omitted)).

Davis was charged with possession with intent to distribute. As noted above, the Government had to prove that Davis intended to distribute the drugs that he purchased from Lephew. Davis's prior conviction for distributing drugs in prison, therefore, was proper evidence of his intent. Accordingly, the district court did not abuse its discretion when it allowed the Government to introduce Davis's prior drug-related felony convictions.

C.

Defendants also contend that the district court erred by allowing the Government to introduce into evidence inmate visiting request forms, which listed Davis's visitors while he was housed at the Mecklenburg Correctional Center and Taylor's visitors while he was housed at the Lunenburg Correctional Center. Defendants argue on appeal that the forms were both hearsay and not relevant to the offense charged and, therefore, inadmissible. We disagree.

First, the forms were introduced by Deborah Lockhart, an employee of the Virginia Department of Corrections. Lockhart identified the forms as documents that were ordinarily maintained in the course of business by the Virginia Department of Corrections. Thus, the forms were admissible pursuant to the business records exception to the hearsay rule. See Fed. R. Evid. 803(6).

Second, although the visitation request forms did not relate to the Bland Correctional Center and were generated prior to the dates alleged in the indictment, they were relevant to the charged offense. Of the two packages that were intercepted by Postal Inspectors, Lephew identified the package with a return address from Ridgeway as having been sent by Taylor's friends, and the package with a return address from Lynchburg as having been sent by Davis's friends. The forms were introduced to establish that Davis had friends from Lynchburg, and that Taylor had friends from Ridgeway. Thus, the forms were in fact relevant to the pending charges.

11

D.

Next, Davis argues that the district court erred by allowing the Government to cross-examine several of Taylor's witnesses as to Davis when no questions were asked by Davis, and Taylor asked no questions during direct examination about Davis. Defendants argue that because the Government's cross-examination of Taylor's witnesses did not relate to the subject matter of the direct examination, the questioning violated Rule 611(b) of the Federal Rules of Evidence. We disagree. As the Government notes, Davis appears to concede that the evidence was admissible but argues that it should have been introduced in the Government's case. As such, the cross-examinations did not violate Rule 611, which provides, in pertinent part, that "[t]he court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). Here, the district court simply permitted the Government to inquire into additional matters as if on direct examination. As such, there was no error.

E.

Next, Defendants contend that the district court erred when it allowed the Government to introduce drugs and packages into evidence without establishing a proper chain of custody. More particularly, Defendants assert that the Government failed to identify any marks or distinctive characteristics of the fungible exhibits, i.e., the drugs, that would allow such exhibits to be properly identified with any degree of certainty.

The "chain of custody" rule is found in Rule 901 of the Federal Rules of Evidence, which provides, in pertinent part, as follows:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Fed. R. Evid. 901(a). Authentication or identification conforming with the requirements of Rule 901 is satisfied by the testimony of a

12

witness with knowledge. Indeed, as this Court has pointed out, the "`chain of custody' is not an iron-clad requirement, and the fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material aspect." United States v. Howard-Arias, 679 F.2d 363, 366 (4th Cir. 1982) (internal quotation marks omitted).

Here, Postal Inspector Vlug testified that the drugs introduced into evidence were the same drugs taken from the two packages addressed to Lephew. Moreover, Meade R. Drumgold, a forensic chemist with the U.S. Postal Inspection Service, testified that the drugs introduced into evidence, which were in sealed bags bearing his initials, were the same drugs that he had evaluated. This testimony sufficed to establish the requisite chain of custody. See United States v. Ricco, 52 F.3d 58, 61 (4th Cir. 1995) (holding that witness's identification of evidence in sealed vial bearing his initials was sufficient to establish the necessary chain of custody).

F.

At trial, Postal Inspector Vlug was allowed to testify from a lab report that purported to establish the weight and nature of the drugs found in the two packages. Defendants argue that district court erred when it allowed Postal Inspector Vlug to testify as to the weight and identity of the drugs because he had no personal knowledge of the analysis summarized within the lab report, and, therefore, his testimony was inadmissible hearsay. Again, any error was harmless. Because the document from which Postal Inspector Vlug testified was later properly introduced, without objection, it is very difficult to imagine how Postal Inspector Vlug's reading of the document could be reversible error.

G.

Finally, Defendants contend that the district court erred in allowing the Government to introduce the grand jury testimony of three witnesses: William Smith, William Falls, and Edward Mitchell.

13

1. <u>William Smith</u>

At trial, the Government called several of Davis's and Taylor's fellow inmates from the Bland Correctional Center as witnesses. Although the first witness, Smith, had previously testified before the grand jury, he invoked the Fifth Amendment during his trial testimony when asked whether he had ever purchased drugs from Taylor. Smith did state, however, that he told the truth during his grand jury testimony. As a result, the Government asked Smith several questions concerning his grand jury testimony. Among other things, Smith confirmed that he had told the grand jury that he had purchased marijuana from "L.A." and as payment sent a money order to Virginia Taylor, Taylor's wife. Smith was then cross-examined by Davis and Taylor. Smith answered all of their questions.

First, Defendants argue that the introduction of Smith's grand jury testimony was erroneous because Smith was not "unavailable" for purposes of Rule 804. In the alternative, Defendants argue that even if Smith was unavailable for purposes of Rule 804, his statement -- made during his grand jury testimony -- that he purchased drugs while in prison was not admissible pursuant to Rule 804(b)(3) as a statement against interest or pursuant to Rule 801(d)(2)(E) as a statement of a coconspirator in furtherance of the conspiracy. Finally, Defendants argue that the introduction of Smith's grand jury testimony violated their Sixth Amendment right to confront witnesses.

Despite Defendants' contentions to the contrary, Smith's grand jury testimony was not introduced into evidence. Rather, Smith was asked if his answers to specific questions from the grand jury continued to be correct. His grand jury testimony was never read into the record. Moreover, Smith was available for and was cross-examined by defense counsel. Thus, Defendants' Sixth Amendment right to confront Smith was simply not infringed.

2. <u>William Falls and Edward Mitchell</u>

At trial, William Falls and Edward Mitchell refused to answer any questions despite an order of the district court to do so. As a result, portions of their grand jury testimony were introduced into evidence pursuant to Rule 804(b)(3). In Falls's grand jury testimony he stated

14

that he purchased marijuana from J.C. Martin and sent a money order to Virginia Taylor as payment. Falls's criminal record was then introduced into evidence. In Mitchell's grand jury testimony he stated that he purchased marijuana from Taylor. His criminal record was also introduced into evidence.

On appeal, Defendants first argue that the introduction of Falls's and Mitchell's grand jury testimony was erroneous because neither Falls nor Mitchell was "unavailable" for purposes of Rule 804. In the alternative, Defendants argue that even if Falls and Mitchell were unavailable for purposes of Rule 804, their statements -- made during their grand jury testimony -- that they had purchased drugs while in prison were not admissible pursuant to Rule 804(b)(3). Finally, Defendants argue that the introduction of Falls's and Mitchell's grand jury testimony violated their Sixth Amendment right to confront witnesses. We address these arguments in turn.

a.

Rule 802 of the Federal Rules of Evidence provides that hearsay is not admissible into evidence except as provided by law, and Rule 804 provides exceptions to Rule 802 when the declarant is unavailable as a witness. Despite Defendants' contentions to the contrary, we conclude that both Falls and Mitchell were "unavailable" for purposes of Rule 804. Rule 804 defines "unavailability" as follows:

> Unavailability as a witness includes situations in which the declarant . . . persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so.

Fed. R. Evid. 804(a)(2). Because Falls and Mitchell refused to testify after being ordered by the district court to do so, they were unavailable under Rule 804(a)(2). Cf. United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995) (holding that the declarant "was unavailable, having asserted his constitutional privilege against self-incrimination").

b.

A statement is against interest if, "at the time of its making[, it] . . . so far tended to subject the declarant to civil or criminal liability . . .

15

that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). Moreover, as the Supreme Court made clear in <u>Williamson v. United States</u>, 512 U.S. 594, 603 (1994),"[e]ven statements that are on their face neutral may actually be against the declarant's interest."

Again, despite Defendants' contentions to the contrary, Falls's and Mitchell's statements were adverse to their penal interests. Both admitted to buying drugs while in prison. A statement made to a grand jury admitting involvement in a criminal act, such as that made by Falls and Mitchell, is adverse because of the potential for criminal liability. <u>See Bumpass</u>, 60 F.3d at 1102. Because the statements actually subjected Falls and Mitchell to criminal liability, the district court did not abuse its discretion by admitting the statements into evidence pursuant to Rule 804(b)(3).

c.

Finally, Defendants contend that the admission of Falls's and Mitchell's grand jury testimony violated their Sixth Amendment right to confront witnesses. In <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), the Supreme Court noted that a statement is admissible and does not violate the Confrontation Clause where there is a necessity (<u>i.e.</u>, the witness is unavailable) and the statement bears sufficient "indicia of reliability" in that it falls within a "firmly rooted hearsay exception," or has "particularized guarantees of trustworthiness" such that "there is no material departure from the reason of the general rule." <u>Id.</u> at 65-66 (internal quotation marks omitted).

In <u>Lee v. Illinois</u>, 476 U.S. 530 (1986), the Supreme Court noted that confessions made by co-conspirators have a rebuttable "presumption of unreliability" and do not fall within a"firmly rooted" hearsay exception. <u>Id.</u> at 543. In footnote 5, the Court also seemed to reject a broad application of the statement-against-penal-interest exception to allow the admissibility of confessions, observing that the "concept defines too large a class for meaningful Confrontation Clause analysis." <u>Id.</u> at 544 n.5. Whether statements against penal interest can qualify as a firmly rooted hearsay exception as a class or whether each statement must qualify through its particularized guarantee of trustworthiness has divided the Circuit Court of Appeals since <u>Lee</u>.

16

Cf., e.g., United States v. Moses, 148 F.3d 277, 281 (3d Cir. 1998) (declining to decide if firmly rooted), cert. denied, 119 S. Ct. 1047 (1999); United States v. Keltner, 147 F.3d 662, 671 (8th Cir.) (firmly rooted), cert. denied, 119 S. Ct. 574 (1998); LaGrand v. Stewart, 133 F.3d 1253, 1268-69 (9th Cir.) (suggesting firmly rooted in dicta), cert. denied, 119 S. Ct. 422 (1998); Neuman v. Rivers, 125 F.3d 315, 319 (6th Cir.) (firmly rooted), cert. denied, 118 S. Ct. 631 (1997); Earnest v. Dorsey, 87 F.3d 1123, 1131 (10th Cir. 1996) (not firmly rooted); United States v. Trenkler, 61 F.3d 45, 62 (1st Cir.1995) (assuming firmly rooted); United States v. Matthews, 20 F.3d 538, 544-46 (2d Cir. 1994) (declining to decide if firmly rooted); United States v. Flores, 985 F.2d 770, 775-76 (5th Cir. 1993) (not firmly rooted); United States v. York, 933 F.2d 1343, 1363 (7th Cir. 1991) (firmly rooted). Indeed, this very question recently split the Supreme Court. See Lilly v. Virginia, 119 S. Ct. 1887, 1898-99 (1999) (plurality opinion) (plurality concluded that statements against penal interest do not qualify as a firmly rooted hearsay exception as a class).

We need not decide whether Falls's and Mitchell's statements fall within a "firmly rooted hearsay exception," or, for that matter, whether their statements were admissible due to their particularized guarantee of trustworthiness because even if the district court erred in admitting the challenged statements into evidence, we conclude that the error was harmless. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (holding that Chapman harmless error analysis applies to Confrontation Clause errors). Since at least Chapman v. California, 386 U.S. 18 (1967), an otherwise valid conviction should not be set aside if the constitutional error was harmless beyond a reasonable doubt. Id. at 24. Whether an error is harmless beyond a reasonable doubt depends upon several factors. We consider, among other things, the importance of the witnesses' testimony in the Government's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witnesses on material points, and, of course, the overall strength of the Government's case. See Van Arsdall, 475 U.S. at 684.

Here, the grand jury testimony of Falls and Mitchell was simply not vital to the Government's case. In the portion of Falls's grand jury testimony that was read into the record, Falls stated that he paid for his drug purchases by sending money orders to Taylor's wife. The

17

Government, however, had already established, through the testimony of Crystal Blain, manager of Global Express Money Orders, that prisoners at the Bland Correctional Center had sent Taylor's wife hundreds of money orders during the course of the alleged conspiracy. Moreover, both Smith and Lowell France testified that they sent Virginia Taylor money orders as payment for their drug purchases. In the portion of Mitchell's testimony that was read into the record, Mitchell stated that he purchased drugs from Taylor while in prison. At trial, however, the Government established, through the testimony of Lephew and France, that Taylor was selling drugs in prison.

In the end, we conclude that there was no real possibility that cross-examination would have done "[s]erious damage to the strength of the [Government's] case." Davis v. Alaska, 415 U.S. 308, 319 (1974). As noted above, Falls's and Mitchell's grand jury testimony was corroborated by the Government's other witnesses. See Idaho v. Wright, 497 U.S. 805, 823 (1990) (considering corroborating evidence when engaging in harmless error review). Given the overall strength of the Government's case, the presence of corroborating evidence, and the insignificance of Falls's and Mitchell's testimony, we conclude that any error in the admission of Falls's and Mitchell's grand jury testimony was harmless beyond a reasonable doubt.

V.

Taylor and Davis also challenge their sentences. See U.S. Sentencing Guidelines Manual (1997). First, Defendants argue that the district court abused its discretion in departing upward from the Sentencing Guidelines pursuant to § 4A1.3, p.s. Next, Defendants contend that the district court erred in calculating the weight of the drugs attributable to the conspiracy. We address these claims in turn.

A.

Defendants first argue that the district court abused its discretion in departing upward from the Sentencing Guidelines pursuant to § 4A1.3, p.s. A district court's decision to depart is reviewed for abuse of discretion. See Koon v. United States , 116 S. Ct. 2035, 2043 (1996) ("[A]ppellate court[s] should not review the departure decision

18

de novo, but instead should ask whether the sentencing court abused its discretion.").

Section 4A1.3, p.s. provides, in pertinent part, as follows:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

U.S.S.G. § 4A1.3, p.s. In promulgating § 4A1.3, p.s., the Sentencing Commission has explicitly authorized an upward departure from the otherwise applicable Guidelines range if a defendant's criminal history category does not adequately reflect his past criminal conduct. In United States v. Wilson, 913 F.2d 136, 138-39 (4th Cir. 1990), this Court made it clear that such departures are appropriate.

Here, Davis has a total of 26 criminal history points, 13 more than the minimum required for a criminal history category of VI. This fact alone establishes that Davis's criminal history category does not adequately reflect his past criminal conduct. In addition, Davis had 25 prior convictions that received no criminal history points because they, among other things, were too remote to be counted in the criminal history computation. See U.S.S.G. § 4A1.2(e). Of these uncounted offenses at least one, a 1979 felony conviction for conspiring to deliver drugs to an inmate, was similar to the instant offense. Given the extent of Davis's criminal history, we cannot say that the district court abused its discretion in determining that it should depart above the guideline range pursuant to § 4A1.3, p.s.

Davis also contends that the district court abused its discretion in departing to the extent that it did, and in failing to explain why a lesser departure would not have been adequate. When a sentencing court departs pursuant to § 4A1.3, p.s., the court typically must address each sentencing category -- or, in this case, each offense level -- and move to a higher one only after finding that each category is inadequate to reflect the seriousness of the defendant's record. See United States v. Rusher, 966 F.2d 868, 884 (4th Cir. 1992). Here,

19

after reviewing Davis's lengthy criminal history, the district court concluded that Davis should be sentenced as a career offender under § 4B1.1. Davis contends that the district court, by failing to provide specific reasons as to why each subsequent criminal offense level was not appropriate, did not comply with the mandate of Rusher. For the reasons that follow, we disagree.

In United States v. Cash, 983 F.2d 558, 562 (4th Cir. 1992), this Court held that "[o]nce the district court determines that a departure under U.S.S.G. § 4A1.3, p.s. is warranted and that the defendant's prior criminal conduct is of sufficient seriousness to conclude that he should be treated as a career offender, the district court may depart directly to the guideline range applicable to career offenders similar to the defendant." Id. at 562; see also United States v. Hines, 943 F.2d 348, 354-55 (4th Cir. 1991) (per curiam). Here, Davis's criminal record, which includes prior convictions for, among other things, murder and assault with a dangerous weapon, is of sufficient seriousness that he should be treated as a career offender. See U.S.S.G. § 4B1.1. Thus, the district court's decision to sentence Davis as a career offender was in complete accord with this Court's holding in Cash. As important, the district court's decision satisfies the mandate of Rusher, as this Court specifically held that

> analogizing to the career offender guideline provides a reasoned basis for the extent of the departure. When a district court properly employs this approach, this determination includes an implicit finding that each successive Criminal History Category that would not produce a career offender sentence inadequately represents the seriousness of the defendant's criminal conduct. Therefore, we conclude that level by level consideration is unnecessary under these circumstances.

Cash, 983 F.2d at 562.

Taylor's argument likewise lacks merit. Taylor had a robbery conviction that was consolidated with another robbery conviction. Had the sentencing for these two offenses occurred independent of one another, Taylor would have been classified as a career offender in the instant case. As such, Taylor's situation is identical to the one faced

20

by this Court in <u>Hines</u>. In <u>Hines</u>, this Court affirmed a sentence imposed when the district court departed upward under § 4A1.3, p.s. and sentenced the defendant as a career offender because two of the defendant's prior crimes of violence had been consolidated for sentencing purposes and therefore did not constitute the two separate predicate felony convictions required to qualify the defendant as a career offender under § 4B1.3. <u>Hines</u>, 943 F.2d at 353-54 (citing U.S.S.G. §§ 4A1.2(a), 4A1.2, comment. (n.3), and 4B1.2(3)). Other circuits agree with this result. <u>See United States v. Gonzales</u>, 929 F.2d 213, 217-20 (6th Cir. 1991); <u>United States v. Dorsey</u>, 888 F.2d 79, 80-81 (11th Cir. 1989). The same reasoning applies here. A departure to the career offender guideline range is proper because Taylor's conduct qualifies him as a de facto career offender.

B.

Defendants also contend that the district court erred in calculating the weight of the drugs attributable to the conspiracy. To give due deference to a district court's application of the Sentencing Guidelines, we review factual determinations for clear error and legal questions de novo. <u>See United States v. Blake</u>, 81 F.3d 498, 503 (4th Cir. 1996).

Two of the packages that Lephew was to deliver to Davis and Taylor were intercepted by Postal Inspectors. The first package contained 3.41 grams of marijuana, ten diazepam tablets, and 1.16 grams of a mixture containing d-methamphetamine. The second package contained a total of 10.83 grams of cocaine powder. In order to complete the guideline computations in this case, the district court had to determine a total amount of illegal drugs associated to the conspiracy. To do so, the district court converted the known drug amounts from the last two packages into their marijuana equivalents in kilograms. <u>See</u> U.S.S.G. § 2D1.1, comment. (n.10). Here, the drugs in question were converted as follows:

> 3.41 grams of marijuana = .00341 kg. of marijuana
> 10 diazepam tablets = .00125 kg. of marijuana
> 1.16 grams of d-methamphetamine = 1.16 kgs. of marijuana
> 10.83 grams of cocaine = 2.16 kgs. of marijuana

21

The total of marijuana equivalents in the two packages, therefore, was 3.324 kilograms. The district court divided that number in half to derive an average equivalent per package. Thus, the district court determined that the average quantity of drugs in each package was 1.662 kilograms of marijuana. The district court multiplied this number by 146 weeks, the number of weeks that the conspiracy existed. Under the district court's calculation, the total drug quantity attributable to the conspiracy was 242 kilograms of marijuana.

On appeal, Defendants argue that the district court erred in finding the average quantity of drugs in each package to be 1.662 kilograms of marijuana. In particular, Defendants contend that the district court inaccurately assumed the delivery of cocaine, d-methamphetamine, and diazepam in every package delivered during the course of the conspiracy, when the record would only support two deliveries of cocaine and one delivery of d-methamphetamine and diazepam. According to Defendants, the weekly deliveries, with rare exception, only contained marijuana.

To be sure, the evidence on this matter, all of which came from Lephew's testimony, is conflicting. When asked by the defense whether he only received cocaine twice, Lephew answered in the affirmative. Moreover, Lephew stated that he only delivered pills to Davis and Taylor on one occasion. However, when asked by the Government if the drugs found in the first two packages were typical of the packages he delivered each week, Lephew answered in the affirmative. In fact, Lephew specifically testified that the quantity of cocaine in the second intercepted package was close to the amount he usually received. Similarly, when asked during his grand jury testimony about the delivery of cocaine, Lephew responded that it would come maybe two or three times per month.

Based on Lephew's trial and grand jury testimony, we cannot say that the district court's calculation as to the amount of cocaine and marijuana in each package was clearly erroneous. Although there is very little evidence that each package contained d-methamphetamine or diazepam tablets, even if those two drugs had not been considered by the district court, the total drug quantity attributable to Defendants in the conspiracy would be over 100 kilograms of marijuana equivalents. As a result, Defendants' base offense level would remain the

22

same. <u>See</u> U.S.S.G. § 2D1.1(c)(7) (base offense level of 26 for at least 100 kilograms but less than 400 kilograms of marijuana). Thus, any error was harmless.

VI.

For the foregoing reasons, Defendants' convictions and sentences are affirmed.

<u>AFFIRMED</u>

23